IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2018

**STATE OF TENNESSEE v. WILLIAM S. VANWINKLE**

**Appeal from the Circuit Court for Rutherford County**
**No. F-72538, F-74515, M-75892      Royce Taylor, Judge**

_____

**No. M2017-00812-CCA-R3-CD**

_____

The Defendant, William S. Vanwinkle, pleaded guilty in case numbers F-72538 and F-74515 to initiating a process intended to result in the manufacture of methamphetamine, *see* T.C.A. § 39-17-435, and in case number M-75892 to shoplifting, *see id.* § 39-14-146. In this appeal, the Defendant contends that the twenty-year effective sentence imposed in this case is excessive and that the trial court erred by denying all forms of alternative sentencing. After a thorough review of the record, the briefs of the parties, and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

William Henry Stover, Nashville, Tennessee, for the Appellant, William S. Vanwinkle.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Jennings H. Jones, District Attorney General; and Allen D. Hale, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**FACTS AND PROCEDURAL HISTORY**

On January 18, 2017, the Defendant pleaded guilty in case number F-72538 to one count of initiating a process intended to result in the manufacture of methamphetamine, in case number F-74515 to one count of initiating a process intended to result in the manufacture of methamphetamine, and in case number M-75892 to one count of shoplifting. The transcript of the guilty plea submission hearing was not made a part of the record on appeal.

At the March 21, 2017 sentencing hearing, Rutherford County Sheriff's Office Deputy Michael Paul Moody testified that on May 21, 2014, he went to a residence to serve an active criminal warrant on Ms. Lisa Martin. Deputy Moody found Ms. Martin at that address and placed her under arrest. While he was at the residence, he encountered the Defendant and Ms. Martin's mother, Ms. Theresa Busey. Deputy Moody transported Ms. Martin "to booking and served the warrant," and, as he was leaving the sheriff's office, he "heard a call coming out" at the residence of "an unwanted guest situation."

Deputy Moody and other deputies went to the residence and encountered Ms. Busey, who indicated that she wanted the Defendant to leave the property. Initially, Ms. Busey and the Defendant argued about Ms. Martin's purse, and, eventually, Ms. Busey indicated that the Defendant was preventing her from accessing a barn at the rear of her property. Deputy Moody walked around the barn at issue and observed two burn piles. "In the burn piles were some mason jars with white residue [and] lithium strips from busted batteries." Near the barn, Deputy Moody observed "a jug of muriatic acid and some empty lighter fluid bottles laying around."

Deputy Moody testified that he had encountered methamphetamine manufacturing laboratories as part of his duties and that, as a result, he had some familiarity with the accoutrement to the manufacture of methamphetamine. He said that the items located inside the burn piles and near the barn were typically involved in the manufacture of methamphetamine. Ms. Busey granted Deputy Moody permission to enter the barn, but the door was locked with a padlock. Ms. Busey did not have a key to the lock, and she told Deputy Moody that the Defendant "had threatened her with physical violence if she went anywhere near" the barn. The Defendant denied any knowledge of the lock and any ownership interest in the barn. Ms. Busey provided Deputy Moody her written consent to cut the padlock with bolt cutters and enter the barn.

Immediately upon entering the barn, a deputy from the narcotics division ordered everyone out of the barn because "there was something smoking in the back of the building." Deputy Moody observed "a coke bottle with a rubber hose coming out of it" as well as other items generally associated with an active methamphetamine manufacturing operation.

After other deputies retrieved all the items from the barn, Deputy Moody placed the Defendant under arrest and transported him to the sheriff's office. During the booking process, officers discovered the key to the padlock in the Defendant's pants pocket.

Ms. Busey testified that in February of 2014, the Defendant, whom she had never met, came to the back door of her residence in apparent physical distress and asked to see Ms. Martin. Ms. Busey said that the Defendant stayed at the residence from that point until his May 2014 arrest and that Ms. Martin nursed a bad burn that went from "the upper part of his body down to the knees." Ms. Busey said that the Defendant told them he had been burned when "his radiator had blowed [sic] up." Ms. Busey recalled that the Defendant remained bedridden for "[t]wo or three weeks to a month." After the Defendant began moving around independently, he began to go out to the barn "every day or every night. If he didn't come during the day, he would come at night."

Ms. Busey said that when the Defendant and Ms. Martin began to frequent the barn, they changed the locks and forbade Ms. Busey from entering it. The Defendant and Ms. Martin also forbade Ms. Busey from attending her church. Around this same time, the Defendant began "burning trash in the yard." She said, "He burnt more trash out there what time he was there than I burnt out there my whole life out there."

Ms. Busey recalled that immediately after Ms. Martin was arrested, the Defendant "started prowling through everything [Ms. Martin] had," saying that "he was going to get the money to go get her out." When Ms. Busey saw the Defendant with Ms. Martin's purse, she asked him to leave, and he refused. Ms. Busey called the police. When the police arrived, Ms. Busey gave them permission to enter the barn but told them that she did not have a key to the lock that had been placed on the door to the barn.

Ms. Busey said that because the barn had been used to manufacture methamphetamine, state authorities had placed it under quarantine. She said that authorities told her that the barn would have to be decontaminated before it could be used again or sold.

Ms. Busey acknowledged having purchased cold medication for the Defendant during the time that he stayed at her house because she "thought he was sick." She did not suspect that the Defendant and Ms. Martin were manufacturing methamphetamine and instead thought they were stealing her possessions. She thought the Defendant would leave after Ms. Martin was arrested. She wanted the Defendant gone before then, but she had not asked him to leave because she did not want to upset Ms. Martin. Ms. Busey testified that after the Defendant moved in, she "couldn't keep money" in her purse and that she "had to sleep in [her] clothes and keep it in [her] bra and in [her] pants."

Ms. Tasha Luscinski testified that on May 21, 2014, Ms. Martin came to her residence in a vehicle driven by the Defendant. Ms. Luscinski described what happened next, "She said can you do me a favor. Can you run down to the store and get me some medicine? They won't sell it to me." Ms. Luscinski agreed and got into the vehicle with

the Defendant and Ms. Martin. When they arrived at a drugstore, they told Ms. Luscinski to purchase Allegra D and provided her with $40. Ms. Luscinski recalled that the medication cost only $15, but the Defendant told her to keep the change.

Rutherford County Sheriff's Office Detective Curtis Brinkley testified that he had extensive training in the detection and investigation of methamphetamine manufacturing operations. Detective Brinkley was called to the residence to investigate a possible methamphetamine manufacturing operation. When he arrived, other officers advised that "they had already found some items they believed to be associated with methamphetamine production" and "that there was some type of fume coming out of the storage building." Detective Brinkley testified that all of the materials necessary for the manufacture of methamphetamine using what he called the "one-pot" or "shake and bake" method were present in and around Ms. Busey's barn and that officers located an "active gasser" inside the barn. He said that particular process for manufacturing methamphetamine was extremely volatile and could result in severe burns. Detective Brinkley also discovered several jars that contained urine in the barn, which was indicative of a methamphetamine manufacturing operation. He explained, "It's been known that meth cooks will take user urine and run it through the gassing process in an attempt to pull crystalized meth out of the urine."

Detective Brinkley said that he and other trained officers "neutralized the hazmat portion of" the methamphetamine manufacturing operation inside Ms. Busey's barn. After the materials were removed from the barn, the barn was placed under quarantine. He explained that the methamphetamine manufacturing operation discovered inside the barn was a "Tier 3," or nearly the most difficult to clean up. He said that Ms. Busey would "have to first contact an industrial hygienist" to test the level of contamination and then pay for the decontamination. He said that the decontamination would cost thousands of dollars. Detective Brinkley testified that the property would remain under quarantine until an industrial hygienist certified that "the clean-up has been conducted."

Detective Brinkley testified that an online database tracked the purchase of medications containing pseudoephedrine, and the database showed that Ms. Luscinski purchased Allegra D on May 21, 2014, at 5:48 p.m.

Upon viewing photographs taken during a 2015 traffic stop involving the Defendant, Detective Brinkley, who did not participate in the stop but had been declared an expert in methamphetamine manufacturing operations, identified all the materials necessary to complete the process of manufacturing methamphetamine inside the vehicle. Detective Brinkley noted in particular the specific off-brand drain cleaner located inside the vehicle was the same as that found inside Ms. Busey's barn. He said that the brand stood out to him because he had only seen that particular brand on those two occasions.

Rutherford County Sheriff's Office Detective Dennis Ward testified that he was present during the investigation of the methamphetamine manufacturing operation in Ms. Busey's barn as well as the investigation of methamphetamine production inside a vehicle during a traffic stop of the Defendant's vehicle in March 2015. Detective Ward said that he noted in particular that the same off-brand drain cleaner was found in both locations. He said that although he had investigated multiple methamphetamine manufacturing operations, he had seen this particular brand on only those two occasions.

Ms. Lisa Martin testified that she had known the Defendant "maybe a week, a couple of weeks" before he came to Ms. Busey's residence looking for her. She said that the Defendant had significant burns to his legs and groin area. Ms. Martin said that the Defendant confided in her that he was burned when the bottle he was using to make methamphetamine using the shake-and-bake method caught fire in his lap. She testified that the Defendant was bedridden for a time and that even after he recovered "[h]e pretty much didn't leave" Ms. Busey's house. She said that during this time, the Defendant was manufacturing methamphetamine inside Ms. Busey's barn and at his mother's residence. Ms. Martin acknowledged having used methamphetamine during that time and witnessing the Defendant make the drug. She maintained, however, that she did not begin using the drug until she started hanging around the Defendant.

Ms. Martin testified that she was familiar with the ingredients for manufacturing methamphetamine because the Defendant had sent her to purchase them. She denied knowing how to complete the process herself. Ms. Martin said that the Defendant made methamphetamine often, which required that they burn "garbage that he had left over" at least "[a] couple of nights a week." Ms. Martin insisted that Ms. Busey did not know the Defendant was making methamphetamine in the barn and that she and the Defendant prevented Ms. Busey from entering the barn.

During cross-examination, Ms. Martin testified that on the day she was arrested, she told the Defendant to get money out of the back of her checkbook to bail her out of jail.

The forty-year-old Defendant testified that the presentence report contained accurate information regarding his background. He said that his father committed suicide when the Defendant was fifteen years old and that his father's death affected his mental health. The Defendant testified that he lost his "left leg above the knee" due to injuries he sustained in a four-wheeler accident when he was twenty-two years old. The Defendant said that he began using methamphetamine in 2013 after he met Ms. Martin. He said that they began using the drug together. The Defendant said that he was addicted

to the drug and had never actually tried to stop using it. He acknowledged using methamphetamine during the pendency of his criminal matters.

The Defendant insisted that he did not ever manufacture methamphetamine, saying, "I do not cook. I don't know how to cook." He denied manufacturing methamphetamine in Ms. Busey's barn, but he admitted purchasing the materials necessary to manufacture the drug. He admitted altering some of the materials so that they could be used to manufacture methamphetamine but denied having burned trash at Ms. Busey's residence.

During cross-examination, the Defendant conceded that he purchased pseudoephedrine on multiple occasions to be used in the manufacture of methamphetamine. He also acknowledged having purchased pseudoephedrine pills only a month before the sentencing hearing, but he insisted that those pills were for his mother. He acknowledged that he was prevented from purchasing pseudoephedrine on multiple occasions because he had already purchased the amount allowed under the law for the month. He refused to say for whom he had purchased the pills to manufacture methamphetamine. He said that neither Ms. Busey nor Ms. Martin was manufacturing methamphetamine inside Ms. Busey's barn and denied that he was making methamphetamine at that location. He refused, however, to say who was making the methamphetamine.

The Defendant acknowledged that, after making bond, he was arrested in a vehicle that contained a mobile methamphetamine laboratory but denied knowing that the laboratory was inside the vehicle. After the Defendant made bond in that case, he was arrested after officers stopped his vehicle and discovered the materials to manufacture methamphetamine inside the vehicle. He denied that he used those materials to make methamphetamine, insisting that he was just hauling off trash he found in his front yard. He believed that Ms. Martin had put those materials in his front yard.

The Defendant admitted that if subjected to a drug test on the day of the sentencing hearing, he would probably test positive for using methamphetamine. He said that he had used methamphetamine "several days" before the sentencing hearing but refused to say where he had procured the drug.

Ms. Jamaica Ivey testified in rebuttal that she was arrested after the vehicle she was traveling in with the Defendant was stopped. Ms. Ivey said that she had seen the Defendant manufacture methamphetamine at his residence. Ms. Ivey said that she had purchased pseudoephedrine pills at the Defendant's request. She said she did not know how to make methamphetamine.

In arriving at a sentence of ten years for each of the Defendant's felony convictions, the trial court found "that the Defendant was the leader in the commission of an offense involving two or more criminal actors." The trial court also found that Ms. Busey was a victim of the Defendant's manufacturing methamphetamine on her property, that the Defendant took advantage of her due to her age and physical condition, and that Ms. Busey had suffered significant damage to her property due to the Defendant's manufacturing methamphetamine on the premises. The trial court concluded that the Defendant had no hesitation about committing the crime despite that "this is a dangerous process" with a high risk to human life. The court emphasized, "There is no question in my mind that [the Defendant] was the one that was in there cooking it." The court concluded that no mitigating factors were applicable and that the enhancement factors warranted a sentence greater than the minimum.

The court determined that "there is no question he was also on bail at the time of the second offense" and observed that consecutive alignment of the ten-year sentences was mandatory. The Defendant was sentenced to eleven months and twenty-nine days for the theft conviction, to be served concurrently with the other convictions. The court noted that the Defendant was not eligible for probation and ordered him to serve his entire twenty-year sentence in confinement.

## ANALYSIS

In this timely appeal, the Defendant contends that the trial court erred by imposing ten-year sentences for his methamphetamine-related convictions and by denying all forms of alternative sentencing. He raises no challenge regarding his theft conviction.

### I. Sentence Length

This court reviews challenges to the length of a sentence under an abuse of discretion standard, "granting a presumption of reasonableness to within-range sentences that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The court will uphold the sentence "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. This court cannot reverse a sentence based on the trial court's failure to adjust a sentence in "light of applicable, but merely advisory, mitigating or enhancement factors." *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The trial court is "to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." *Bise*, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* A sentence

imposed by the trial court that is within the appropriate range should be upheld as long as it is "consistent with the purposes and principles of sentencing, as provided by statute." *Id.* The appealing party bears the burden of proving that the sentence was improper. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining "the specific sentence and the appropriate combination of sentencing alternatives," the trial court must consider: (1) the evidence at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the applicable mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. T.C.A. § 40-35-210(b).

The argument in the Defendant's brief regarding the length of the sentence is merely a quarrel with the trial court's application of the enhancement and mitigating factors. He argues that the trial court erred by applying enhancement factors due to Ms. Busey's vulnerability and the high risk to human life and by applying those factors to both of his convictions. However, under *Bise*, "a trial court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing decision." *Bise*, 380 S.W.3d 682, 709-10. The trial court is free to choose a sentence within the proper range so long as the trial court's choice reflects an application of the purposes and principles of sentencing set out by statute. Because the sentence length in this case reflects the appropriate application of the purposes and principles of the Sentencing Act, we conclude that the trial court did not abuse its discretion by imposing a ten-year sentence for each of the Defendant's convictions.

## II. Alternative Sentencing

The Defendant also challenges the trial court's denial of all forms of alternative sentencing. The State concedes that the trial court erred by determining that the Defendant was statutorily ineligible for probation but argues that the record supports the trial court's decision to order the Defendant to spend the entire sentence in confinement.

Like determinations regarding sentence length, the grant or denial of alternative sentencing is reviewed for an abuse of discretion accompanied by a presumption of reasonableness when the sentencing decision reflects the purposes and principles of sentencing. *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). The defendant bears the burden of establishing suitability for probation and that probation will serve the ends

of justice and the best interest of the public and the defendant. T.C.A. § 40-35-303(b); *Carter*, 254 S.W.3d at 347.

A defendant with a total effective sentence in excess of ten years is eligible for probation if the individual sentences imposed for the convictions fall within the probation eligibility requirements. *See* T.C.A. § 40-35-303(a). A defendant is not entitled to a presumption that he is a favorable candidate for probation. Additionally, the Defendant was convicted of a Class B felony, and, therefore, was not considered to be a favorable candidate for alternative sentencing. *See* T.C.A. §§ 39-13-213(2)(A); 40-35-102(6)(A). In determining whether incarceration is an appropriate sentence, the trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103(1).

In this case, the trial court erroneously concluded that the Defendant was not eligible for probation, and, as a result, did not make any of the necessary findings under Code section 40-35-103. Nevertheless, the record fully supports the denial of all forms of alternative sentencing in this case. By his own admission, the Defendant has previously completed two probationary sentences, neither of which deterred him from continuing to manufacture methamphetamine. While released on bond in case number F-72538, the Defendant committed the offense in case number of F-74515. These facts demonstrate that measures less restrictive than confinement have failed to deter the Defendant from continuing criminal activity. In consequence, the denial of alternative sentencing was justified in this case. Additionally, the Defendant's lack of candor, as implicitly found in the trial court's complete rejection of the Defendant's claim that he did not make methamphetamine, supports the denial of probation in this case.

**CONCLUSION**

Based upon the foregoing, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE